SUCCESSION OF DEL TORO, PLAINTIFF AND APPELLANT, *v.* ZAMBRANA, DEFENDANT AND APPELLEE.

APPEAL from the District Court of Mayagüez in an Action for Restitution of Property and for Damages.

No. 1826.—Decided May 31, 1919.

EVIDENCE—OCULAR INSPECTION.—When the trial court believes the witnesses of a party as to certain points of their testimony it errs in not believing them as to other points on which they agreed and were not contradicted by the evidence of the adverse party, and this holding of the lower court cannot be supported on appeal by the allegation that it was the result of an ocular inspection made by the court, when the record does not show that such inspection was made.

ATTORNEY FEES—TEMERITY—DISCRETION OF COURT.—The lower court does not abuse its discretion in not imposing the payment of.attorney fees upon the defendant when the judgment is for less than the amount prayed for, because in that event there could not have been temerity on the part of the defendant in defending.

The facts are stated in the opinion.

*Mr. Ricardo del Toro Soler* for the appellant.

*Messrs. José Sabater* and *Juan Valdejuli* for the appellee.

MR. CHIEF JUSTICE HERNÁNDEZ delivered the opinion of the court.

On May 3, 1917, the Succession of Juan Miguel del Toro y Torres, composed of the persons named in the complaint, brought an action in the District Court of Mayagüez against Alberto Zambrana e Irizarry to recover a certain rural property and damages, alleging as grounds of their action that they are the owners by inheritance from their father, Juan Miguel del Toro y Torres, who died on January 25, 1917, of a saltworks called Caborrojeña in the ward of Boquerón, municipality of Cabo Rojo, which includes a parcel of one and a half acres of land bounded on the south and west by lands of defendant Alberto Zambrana e Irizarry, and that while their ancestor was in possession of that parcel of land, the defendant, on June 6, 1916, maliciously and fraudulently seized it, destroying the fence which separated it from his lands and putting up another fence to separate the said one and a half acres of land from the saltworks, and from that date he has cultivated it and used its products. The plaintiffs further allege that as a result of said act of the defendant they are deprived of the possession of the one and a half acres of land and have sustained damages as follows:

(*a*) Value of the crop which could have been raised, $40.

(*b*) Damage to the evaporators of the saltworks by their being filled with dirty rainwater as a result of the removal of the hedgerow by Zambrana, $300.

(*c*) Value of the salt not made in the dirty evaporators as a result of the facts set forth in paragraph (*b*), $960.

(*d*) Value of the fences destroyed by the defendants, $100.

(*e*) Value of the trees cut down and destroyed by the defendant, $5.

Total, $1,315.

The prayer of the complaint is for judgment that the de-

fendant make restitution to the plaintiffs of the parcel of one and a half acres of land of which they were deprived and indemnify them for all the products which a possessor in bad faith is bound to restore and pay them the sum of $1,315 as damages, with the costs, expenses and attorney fees.

Besides denying in his answer the allegations of the complaint, the defendant set up new matter and made a counterclaim for damages alleged to have been sustained to the amount of $261.

The case was tried and the court entered judgment on January 17, 1918, sustaining the complaint and adjudging that the plaintiff succession recover from defendant Alberto Zambrana e Irizarry the parcel of one and a half acres of land, it being a part of the saltworks called Caborrojeña, and further that the plaintiffs recover from the defendant the sum of $15, with the costs, expenses and disbursements.

From that judgment the plaintiffs appealed to this court only in so far as it adjudged that they recover from the defendant the sum of $15 and failed to award them the attorney fees.

The appellants base their appeal on the following grounds, to wit: First. That the lower court erred in underestimating the evidence of the plaintiffs, considering that it was not contradicted, citing sections 4 and 16 and paragraphs 6 and 7 of section 162 of the Law of Evidence. Second. That the lower court erred in not allowing the plaintiffs to recover exemplary or punitive damages and attorney fees as determined by law, and, furthermore, that, pursuant to section 281 of the Code of Civil Procedure, they are entitled to a judgment for the whole amount of the damages sustained.

Let us examine the evidence of the plaintiffs in support of the claim for damages made in their complaint.

This evidence consisted of the testimony of witnesses Juan del Carmen Montero, Lorenzo Montero and Guillermo

del Toro, the pertinent parts of which are transcribed below.

#### JUAN DEL CARMEN MONTERO.

"\* \* \* Alberto Zambrana is now in possession of the land. He removed the fence which the Toros had there because, as he said, the property was his, and strung some wires along the hedge on the side of the road, \* \* \*. This was done on the sixth or seventh of June, 1916, and Zambrana has since planted corn on the piece of land which yielded forty-five quintals \* \* \*. As a result of Alberto Zambrana's having removed the fence and taken possession of the land the owners of the saltworks have sustained damages, because the fence was very thick and after it was removed when it rained the water flowed into the salt-pans and damaged them. The water was muddy and ran down in a torrent from the high part of the coast. When the hedge existed the water spread and ran slowly, but after the hedge was taken away there was nothing to detain it and the water ran into the salt-pans. When the hedge was there this did not happen, because it served as a breakwater. It became necessary to clean the salt-pans, bailing out the water first, because they cannot be cleaned otherwise; then they had to be left for the mud to dry so as to remove it with shovels. It took seventy days to do this work and the pans gave no immediate results, but came to be in good condition for producing salt some six months thereafter. \* \* \* Six laborers worked there, among them the witness, earning eighty cents a day for a period of seventy days. It is customary to take out the salt during these three months, depending upon the weather. That was the dry season and there was only one rain, but the weather immediately cleared. In brief, if nothing of what occurred had happened, considering the weather, the five salt-pans on the front side, which were damaged, would have produced from six to seven thousand *fanegas* of salt. The witness has been and is at present in charge of the sale of the salt and in that same period of last year they sold the salt at fifteen and twenty-five cents a quintal. The cost of each quintal is nine cents and a *fanega* is three quintals. The fences destroyed by Zambrana were worth $2.50 per lineal acre and their length was four acres. On the piece of land there were some trees which Zambrana felled and cut up into fire-wood, of which he obtained three tons. A ton of this was worth three dollars at that time and the cost of cutting it was one dollar. If the land taken possession of by Zambrana

had been planted with corn it would have produced 45 quintals, which at that time was worth $3.80 per quintal, less fifteen cents each for the cost of gathering and shelling, and the expenses for the whole lot may be estimated at $10 for planting and ploughing."

LORENZO MONTERO.

"* * * That piece of land has an area of one and a half acres. * * * It is worth about $60. * * * Last year Zambrana purchased the parcel of twenty acres of land and endeavored to take possession of the other parcel by taking down the fences or landmarks which the Toros had on the front side. He removed them and made a new fence by stringing some wires along the hedge in a place that did not belong to him. * * * He took down the landmarks bounding their property and thus joined the parcel of land to the twenty acres. * * * Miguel del Toro took down the fence placed by Zambrana, who on the next day ordered it to be replaced, and that parcel of one and a half acres has been since then in the possession of Alberto Zambrana. As a result of these acts of Zambrana the owners of the saltworks sustained damages, because after the hedge they had there as a protection against the water that came down was taken away, there was a heavy rainstorm and the current broke down the embankments and the mud and the water ran into the saltworks, doing great damage, * * *. Before the hedge was removed the water could not enter because the hedge stopped it and instead of flowing directly the current lost its strength. The salt-pans were damaged by the mud which the water brought down and it was impossible to make salt on that account. Then, in order to repair the damage, they first bailed the water out of the salt-pans, which took them twenty or twenty-five days, because it was necessary to let the mud dry; then six workmen worked for seventy days and were paid eighty cents per day. * * * From the day of the flood and the destruction of the fence by Zambrana to the time that the salt-pans were again in condition to produce salt, three months elapsed. During these three months, if nothing had happened, these salt-pans would have produced salt and they usually produce in the months of July, August and September from six to seven thousand *fanegas* of salt. These three months are the season for making salt. * * * Corn is usually planted on the parcel of one and a half acres. The fences destroyed by Zambrana were four lineal acres of hedge which is worth $2.50 per acre. Zambrana cut down the trees that were

there and made fire-wood and charcoal, getting from eight to nine tons of fire-wood worth two dollars per ton net, * * *. Witness remembers that Zambrana took down the hedge on June 6 or 7 and the heavy rain of which he formerly spoke was around the 16th or 18th of July. It had rained before, but the heaviest rainfall was at that time. The flood occurred over a month after the hedge was taken away, but it had already rained and the water had entered the salt-pans; then they began to clean them, not on account of a light shower, because it was quite heavy. After the 7th of June there was a rain and the other was in the month of July. Witness cannot tell exactly when the heavy rain fell, but it was somewhere around the 16th or 18th of July, that is the heavy rain which made the flood. * * * When the hedge was taken away, in order to avoid the flood they were making the embankment higher at the front, but they had not sufficient time to finish the work. They worked, more or less, in the salt-pans and on the embankment some seventy days and before the water came in they worked some 15 or 16 days, he cannot tell exactly. They could not finish the work because the rain made it impossible. * * * The land seized by Zambrana has an area of one and a half acres and that is the place where the strongest current comes down, * * *. The water came in as a result of Zambrana's having taken down the hedge, because the current was strong and the hedge held back the water.''

GUILLERMO DEL TORO.

''He is the manager and part owner of the saltworks. * * * On June 6, 1919, Alberto Zambrana burned the landmarks that they (the plaintiffs) had there and thus joined that parcel of land to his twenty acres and put a fence along the lower side of the road, including that piece of land in his property. They had a hedgerow there and he put up a smaller one and some wires. They destroyed and took it down because the parcel of land was theirs and afterwards Zambrana replaced the fence. * * * As a result of Zambrana's action in taking down the hedge on the higher side of his boundary, as the land forms a glen there, the water falls with greater force and flows over the embankment and the five salt-pans on the front side, * * * which became muddy and therefore did not produce any salt. In order to put the salt-pans in condition to produce salt, a few days after they had to bail the water out of them and then wait until the mud dried in order to clean them, which cost $336, and they had to work for some seventy days to

put them in condition to produce salt. In former years the five salt-pans usually produced during these three months 7,000 *fanegas* of 320 pounds each, a *fanega* being sold at an average of fifty cents and the cost of each quintal being 9 cents, or one cent for the preparation, five for removing and three for shipment. The fence destroyed by Zambrana was worth $10, more or less. Zambrana cut down the trees and made four tons, more or less, of fire-wood and sold it. each ton being worth at the time $3, less $1 for expenses * * * The salt is crystalized in the salt-pans every year during the dry season, according to its duration, with an average for each pan of two crystalizations each month from May until September when the rain begins. At that time the salt is crystalized, for although it rains lightly and sometimes heavily, this does not prevent them from taking out the salt except for a short time. These five pans produce about 7,000 *fanegas* of salt in the two crystalizations which they failed to take out. If it rains when one of the pans is crystalized and the shower is heavy, the salt melts, and then they wait some time until the water evaporates, and when the rain-water evaporates, if it does not rain, the salt crystalizes again, but if it rains, it does not. If the pan is crystalized and ready to be emptied and the shower is not too heavy, they lower the gate and the salt may be taken out, but if it rains hard the salt melts and then it does not crystalize again until after fifteen or twenty days or a month. A few days after Zambrana removed the fence there was a heavy rain and from the 16th to the 18th of July there were several light showers. What the two former witnessess said that about the middle of July there was a heavy rain was a mistake on their part, that being the rain that damaged the pans. A rain falling in the pans when they are crystalized stops the crystalization, but only a rain such as the one which damaged the pans could prevent their producing salt for three months. The rain-water prevents crystalization, but only for a short time. That he usually pays the workmen for taking out salt at the rate of five cents per *fanega* and for cleaning the pans he pays from eighty to ninety cents per day.''

EVIDENCE FOR THE DEFENDANT.

ALBERTO ZAMBRANA.

''He resides in Boquerón, Cabo Rojo, where he owns a property of some 180 acres. The Caborrojeña saltworks of the Toros are adjacent to two properties of the witness, one of them having an

area of 20 acres. * * * He has been in possession of that property since February 3, when he purchased it. When he took possession of the property there were some stumps of shrubbery in the middle of the property, which he set on fire, rooted out and threw away, and he cleaned the place and put it in good condition. On June 7, 1916, Miguel del Toro came accompanied by his son, a policeman and several laborers. Witness was not there, but his overseer was, and the latter went for him and when witness arrived they had gone and he found the fences torn down, all the stakes had been taken away and the shrubbery pulled up, these stakes having been placed there by him. He immediately replaced the fence, for he could not leave the property so exposed, because there was some cattle. He placed that fence near the salt-pans. * * * He recollects that when the fence was destroyed by Miguel del Toro in June of last year there was no rain. The month of June is a dry month and there it rains from the 15th of August on. That year it did not rain in July except an occasional shower. It rains there from the 15th of August on.''

Other witnesses testified for the defendant, but their testimony tends principally to sustain Zambrana's right of ownership to the parcel of land of one and a half acres and not to rebut the oral evidence for the plaintiff.

From the testimony of Juan del Carmen Montero it may be inferred that the one and a half acres of land yielded defendant Zambrana 45 quintals of corn, which at $3.80 a quintal, less 15 cents for expenses per quintal and $10 for planting and ploughing, leave a net profit of $154.25; that the employment of six laborers for 70 days to put the salt-pans in condition to produce salt, at the rate of 80 cents per day each, occasioned a disbursement of $336; that 6,000 *fanegas* of salt which they failed to take out of the five salt-pans, equivalent to 18,000 quintals at a selling profit of 6 cents per *quintal,* make a total of $1,080; that the four acres of fence destroyed, at $2.50 per acre, represent the sum of $10; that three tons of fire-wood which the defendant made from the trees which he felled, at $3 per ton, after deducting $1 for expenses per ton, give a net profit of $6. All the foregoing items total the sum of $1,586.25.

According to witness Lorenzo Montero, six laborers who worked in the saltworks for 70 days at 80 cents a day were paid $336; the four lineal acres of fence which the defendant destroyed, at $2.50 per acre represented $10, and 8 tons of fire-wood which the trees yielded to Zambrana, each ton giving a net profit of $2, amount to $16. Although this witness testified that corn could be planted on the one and a half acres of land and that if the salt-pans had been in condition to produce salt during the month of July, August and September they would have produced from 6,000 to 7,000 *fanegas,* he does not say how much each *fanega* is worth.

According to witness Guillermo del Toro the work of putting the saltworks in condition to produce salt cost $336; the 7,000 *fanegas* of salt which they failed to take out, the expenses for each *fanega* being 9 cents, leaving a net profit each of 41 cents, give the sum of $2,870; 4 tons of fire-wood which Zambrana got from the trees cut down at $3 per ton, less $1 for expenses, represent the amount of $8, and the value of the fence destroyed was $10. These items total $3,224.

When the lower court adjudged that the plaintiffs recover from the defendant the sum of $15 it undoubtedly took as a basis the value which the witnesses for the plaintiffs gave to the fences destroyed by the defendant and to the trees which he cut down, items *d* and *c* of the complaint.

As regards the damages which the plaintiffs claim to have sustained in the evaporators of the saltworks (item *b*), we see no reason why the lower court should not believe the witnesses as to that point of their testimony on which they agreed and were not contradicted, considering that it believed them as to other matters like the taking of the land by the defendant, the destruction of the fences and trees and the estimate of these damages; therefore we are of the opinion that witnesses Juan del Carmen, Lorenzo Montero and Guillermo del Toro told the truth when they testified that the damages to the evaporators by the acts of the de-

fendant amounted to $336, for which reason the plaintiffs are entitled to recover also the $300 which they claim therefor in the complaint. This item was sufficiently proved and the lower court committed manifest error in denying its recovery.

It is otherwise as to the damages claimed under item *c* for the 6,000 *fanegas* of salt which, according to those witnesses, the saltpans failed to produce during the period of three months, since the court could well doubt that this damage was suffered, considering that the witnesses greatly disagreed on the value of that salt, for while Juan del Carmen Montero estimates its value at $1,080, Guillermo del Toro estimates it at almost three times that amount, or $2,870, and the other witness said nothing about it. The same is the case as to item *a,* for witnesses Lorenzo Montero and Guillermo del Toro did not testify with regard to it, and Juan del Carmen Montero, who was the only witness that did, estimated its value at $154.25 while the complaint alleges that it amounted to only $40.

In his brief the appellee calls our attention to the fact that the lower court made an ocular inspection of the land and of the saltworks of the plaintiffs, accompanied by counsel for both parties, and maintains that as a result of that inspection the court arrived at the conclusion that it could not be true that due to a rainstorm a torrent of water had flowed from the lands occupied by the defendant and damaged the saltworks of the plaintiffs, it being physically impossible, and that consequently it could not be true that it took them sixty days to clean the salt-pans, or that they did not produce salt for six months, or that damages had been sustained as testified to by the witnesses who were employees of the saltworks, he being of the opinion that it would be unjust to adjudge against the defendant the payment of a large sum for damages which did not exist.

Neither does the statement of the case nor any other part of the record show that such ocular inspection was made;

therefore it cannot be relied upon to contradict the oral evidence introduced by the plaintiffs.

We shall not consider the question of law raised by the appellants regarding the failure to apply section 281 of the Code of Civil Procedure, for the complaint was not based on the theory of that section, as appears from its allegations and prayer, and the terms of the issue cannot be altered on appeal.

With respect to the attorney fees, we do not see that the lower court abused its discretion in not imposing their payment upon the defendant, considering the difference between what was prayed for in the complaint and what was allowed by the judgment. *Martínez* v. *Padilla,* 19 P. R. R. 555.

For the foregoing reasons the judgment below must be affirmed, but modified to the effect that the defendant pay to the plaintiffs the sum of three hundred dollars in addition to the fifteen dollars awarded them.

*Modified and affirmed.*

Justices Aldrey and Hutchison concurred.

Mr. Justice Wolf dissented.

Mr. Justice del Toro took no part in the decision of this case.

### DISSENTING OPINION OF MR. JUSTICE WOLF.

I dissent on the ground that there is no basis for going contrary to the general finding of the court below of no damages except the specific ones found. The court below evidently did not believe the witnesses as to the more general damages, just as this court did not apparently believe the damages to be as extensive as some of the witnesses claimed. I find no reason in the record for the distinction.